Williams, J.
 

 The appellants insist that the Court of Appeals committed prejudicial error in finding the antenuptial agreement invalid as a matter of law and entering final judgment for the widow, Mary Kenyo Juhasz. In their behalf appellants make two contentions : First, they insist that under the evidence the antenuptial contract was entered into under such circumstances that its validity in view of its formation was a question of fact for the determination of the trial court; and, second, that even if the first contention is unsound, nevertheless the agreement is valid, subsisting and binding because it was not attacked within the six-month period provided by statute. These contentions will be discussed in order.
 

 As to the first contention it is necessary to consider what are the requirements for the valid formation of an agreement of this character.
 

 There are five reported cases of this court which pass upon or discuss the validity of antenuptial contracts as equitable jointures.
 
 Stilley
 
 v.
 
 Folger,
 
 14 Ohio, 610;
 
 Murphy
 
 v. Murphy, 12 Ohio St., 407;
 
 Phillips’ Exrs.
 
 v.
 
 Phillips,
 
 14 Ohio St., 308;
 
 Grogan
 
 v.
 
 Garrison,
 
 27 Ohio St., 50;
 
 Mintier
 
 v.
 
 Mintier,
 
 28 Ohio St., 307.
 

 The latest of these cases was decided at the December term, 1876, and it does not appear that there is any subsequent reported case of this court covering questions arising out of antenuptial marriage settlements. Those cases are authority for the principle that an
 
 *264
 
 antenuptial contract will be upheld if it is fair and reasonable, is not invalidated by fraud or otherwise, and is fully executed on the part of the husband. There have been, however, many adjudications in other jurisdictions during the last half century. The rule supported by the weight of authority may be stated thus: An engagement to marry creates a confidential relation between the contracting parties and an antenuptial contract entered into after the engagement and during its pendency must be attended by the utmost good faith; if the provision for the prospective wife is, in the light of surrounding circumstances, wholly disproportionate to the means of her future husband and to what she would receive under the law, the burden rests on those claiming the validity of the contract to show that there was a full disclosure of the nature, extent and value of the intended husband’s property, or that she had full knowledge thereof without such disclosure, and that she, with this knowledge, voluntarily entered into the antenuptial settlement.
 
 Debolt
 
 v.
 
 Blackburn,
 
 328 Ill., 420, 159 N. E., 790;
 
 Watson
 
 v.
 
 Watson,
 
 104 Kan., 578, 180 P., 242;
 
 In re Waller’s Estate,
 
 116 Neb., 352, 217 N. W., 588;
 
 Harlin
 
 v.
 
 Harlin,
 
 261 Ky., 414, 87 S. W. (2d), 937;
 
 Pattison
 
 v.
 
 Pattison,
 
 129 Kan., 558, 283 P., 483;
 
 In re Flannery’s Estate,
 
 315 Pa., 576, 173 A., 303;
 
 Denison
 
 v.
 
 Dawes,
 
 121 Me., 402, 117 A., 314;
 
 Megginson
 
 v.
 
 Megginson,
 
 367 Ill., 168, 10 N. E. (2d), 815;
 
 In re Enyart’s Estate,
 
 100 Neb., 337, 160 N. W., 120;
 
 In re Maag’s Estate,
 
 119 Neb., 237, 228 N. W., 537. This court is aware that the burden of proof does not shift in Ohio
 
 (Ginn, Admr.,
 
 v.
 
 Dolan,
 
 81 Ohio St., 121, 90 N. E., 141, 135 Am. St. Rep., 761); but is of the opinion that disclosure as a justification or excuse for the disproportionateness is an affirmative defense.
 

 Under the rule, the contract is not invalidated merely because the portion fixed for the bride is small or disproportionate. After being fully informed and ad
 
 *265
 
 vised, the intended wife may be entirely satisfied with the provision made for her, and, if she then voluntarily enters into the contract, she is bound by its terms.
 

 Regarding the nature and extent of the husband’s property, counsel for appellee in their brief state: “ At the time of the execution of the contract, Mr. Juhasz was worth about the same as at his death; the inventory of his estate is $40,376.67. By the terms of the agreement, Mrs. Kenyo is given, at his death, an undivided one-sixth interest in his Cuyahoga county real estate, and nothing else; she is expressly barred of all other rights and benefits of every kind. The Cuyahoga county real estate was inventoried at $13,500. The contract, therefore, gave to Mrs. Kenyo an undivided interest in real property of the value of $2,250, out of an estate of more than $40,000, or approximately 5V2%. In contrast with this small provision in the contract, she would be entitled under the law (deducting debts and charges, amounting to $2,-400) to approximately in excess of $15,500, or 40% of the estate, consisting of her statutory set-off of $2,500, her year’s support estimated at $2,500, the right to live in the mansion house for one year estimated at $600, and one-third of the net residue of the estate.”
 

 Joseph 8. Juhasz and Mary Kenyo became engaged to be married in September, 1933, and their marriage was solemnized October 21, 1933; at that time they were sixty-four and fifty-one years of age, respectively. He died April 25, 1936, after two and a half years of wedded life.
 

 There are, however, other facts to be considered on the subject of disproportionateness. Juhasz had five children, all by his first marriage, and in marrying a third wife he would in the ordinary course' of human affairs give consideration to the natural objects of his bounty. Under the new Probate Code, effective January 1, 1932 (Section 10502-1, General Code, amended September 2, 1935, 116 Ohio Laws, 385), inchoate
 
 *266
 
 dower still exists but, save in certain specified instances, the dower interest does not become choate upon the death of the consort but terminates' and is barred thereby, and in lieu of dower, when so barred and terminated, the surviving spouse is entitled to the distributive share provided for by the statute of descent and distribution. If Mrs. Juhasz made a valid election to take under the law and the antenuptial contract was unenforceable she would get an undivided one-third of all his property and each of his children would get an undivided two-fifteenths thereof (less advancements). Section 10503-4, General Code. On this basis his third wife would receive two and a half times as much as each of his own children. The fact that the contracting parties were of advanced age and the man had children by a former marriage are elements to be considered.
 
 Appeal of Neely,
 
 124 Pa., 406, 16 A., 883. The court can hardly say that an antenuptial agreement giving the third wife somewhat less than each of the children by a former marriage would receive is necessarily unfair and unreasonable as to the prospective wife; but in the instant case the widow would receive only about one-third as much as each child (not considering advancements) under the- provisions of the will and antenuptial contract. By and large the provision was so meager as to warrant a holding that the amount fixed was wholly disproportionate as a matter of law.
 

 The trial court, however, made no express finding as to disproportionateness, but did expressly find that the contract was entered into after full disclosure to and knowledge by Mary Kenyo. It is therefore essential to inquire into the nature of the disclosure as shown by the evidence.
 

 A. B. Cook, an attorney, was employed by Juhasz to draw the antenuptial agreement and a will, and, having prepared them, brought them to the Mentor farm on October 18, 1933, on the occasion of a Hungarian
 
 *267
 
 dinner there to which Mary Kenyo had been invited to meet those present and to make “Streudel,” a Hungarian dish. The attorney took Mrs. Kenyo, who didn’t speak English well but had a good knowledge of the Hungarian language, into a room in the farmhouse and with the aid of an interpreter read and explained the antenuptial contract and will to her and undertook to inform her as to what property his client, Mr. Juhasz, owned. Thereupon the contract and will were executed. Next morning Mr. Juhasz and Mary Kenyo came to the attorney’s office and Mr. Juhasz stated he had given his daughter, Mrs. Mary E. Stine, and her husband the sum of $4,000 under certain conditions and that he wanted it tó be considered as an advancement and have it deducted from the share his daughter would receive. A new will was drawn up in form like the previous except for that addition and was then executed.
 

 Although the disclosure as to the nature and amount of property of the prospective' husband was fairly full and complete, an examination of the evidence shows no mention of the value of the real estate was ever made to her by him or his attorney. Under the rule laid down and sustained by the weight of authority, good faith requires full disclosure not only as to the nature and amount of the intended husband’s property but also of its value. See cases cited
 
 supra.
 

 Mrs. Kenyo with her limited knowledge of property values and of business could hardly be expected to know of her own accord the value of the undivided one-sixth of the real estate in Cuyahoga county in comparison with the value of all Mr. Juhasz’s property. She was, therefore, unaware of what the interest which she would receive was fairly and reasonably worth. Mr. Juhasz had knowledge of these values and the exercise of the utmost good faith on his part required that he should impart it to her. The evidence justified a
 
 *268
 
 holding that, as a matter of law, full disclosure was not made.
 

 It follows that the first contention of counsel for appellant is unsound and that the contract must be considered invalid, provided the attack thereon was made within time.
 

 The second contention of counsel as above indicated is that there was no attack on the agreement within the six-month period.
 

 Section 10512-3, General Code, provides : “Any ante-nuptial or separation agreement to which the decedent was a party shall be deemed valid unless action to set it aside is begun within six months after the appointment of the executor or administrator of the estate of such decedent, or unless within such period of time the validity of such agreement is otherwise attacked.”
 

 Mary Kenyo Juhasz filed an election as surviving spouse of decedent in which she stated: “I * # * hereby elect to take under the law and repudiate the prenuptial contract attached to said will, which was procured by fraud. ’ ’
 

 She also filed in the Probate Court exceptions to the inventory of the executrix in which she excepted to the refusal of the appraisers to set off her year’s allowance and statutory set-off but made no reference to the antenuptial agreement. The court overruled the exceptions and no appeal was taken by the appellee.
 

 It is conceded that six months had elapsed between the appointment of the executrix and the action in partition in which the answer and cross-petition was filed by Mary Kenyo Juhasz attacking the antenuptial agreement. Both the election and exceptions to the account were filed within the six-month period. The attack contemplated by Section 10512-3, General Code, is either by direct action to set aside the antenuptial agreement or by raising the question of the validity or invalidity of the agreement in some other way so that there could be a determination of the issue by a court
 
 *269
 
 of competent jurisdiction. Merely to file a legal paper in a court under such circumstances that the jurisdiction of the tribunal to determine the rights of the parties under an antenuptial agreement is not invoked does not amount to an attack within the meaning of the statute. Any challenge of the contract in a court proceeding- which could result in an adjudication would be an attack within the purview of the statute; a challenge in a court of justice which could result, only in futility would not.
 

 Obviously no determination as to the contract could be made on an election filed in the Probate Court for convincing reasons. An election by a surviving- spouse is regulated by Section 10504-55
 
 et seq.,
 
 General Code. Under these statutory provisions a citation may be issued to compel an election; but whether the citation is issued, the election of the surviving- spouse may be made either in person in the Probate Court or by written instrument signed by the spouse and duly acknowledged and filed in the Probate Court within the time allowed for making an election. If the election is made in person the court is required to explain the provisions of the will and what the rights are under it as well as what the rights are by law. In case of refusal to take under the will, the statutes do. not contemplate a determination of contested rights upon an election whether it is made in person or by written instrument. The filing of the written election by the widow, which election had incorporated in it a statement to the effect that the antenuptial agreement was procured by fraud and was repudiated, did not present an issue on the validity of the agreement for determination by the court. No hearing was had on that issue and the matter is not now pending in that court for hearing thereon.
 

 On hearing the exceptions to the account the Probate Court entered this finding and judgment: ‘ ‘ The court finds that the prenuptial agreement referred to and
 
 *270
 
 incorporated in the will as probated bars the widow from all allowances unless and until such prenuptial agreement is set aside; the court therefore overrules Exception No. 4 of said exceptor asking that the appraisers be ordered to set off the statutory 20% exemptions and a year’s allowance.”
 

 No appeal was taken and the action of the court in effect amounts to an adjudication that that court had no jurisdiction to pass on the validity of the antenuptial contract. In our judgment the position taken by the court was sound.
 

 Since no attack, which invoked the jurisdiction of a court to hear and determine the validity of the contract, was made within the six-month period, the contract must be deemed valid.
 

 The finding of the trial court that there had been full disclosure was not prejudicially erroneous since the decision turns upon the interpretation of Section 10512-3, General Code.
 

 The judgment of the Court of Appeals will be reversed and the judgment of the Court of Common Pleas affirmed.
 

 Judgment reversed.
 

 Weygandt, C. J., Matthias, Day, Zimmerman and Gorman, JJ., concur.
 

 Myers, J., concurs in paragraphs 1, 2, 3 and 4 of the syllabus.